UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DEAN TECHNOLOGY, INC.,      :      Case No. 1:13-cv-00548
                   :
        Plaintiff,      :      Judge Timothy S. Black
                   :
      v.             :
                   :
CE POWER SOLUTIONS, LLC, *et al.*,  :
                   :
      Defendants.    :

**ORDER:**

**(1) DENYING DEFENDANTS' MOTION TO DISMISS FOR LACK OF
SUBJECT-MATTER JURISDICTION (DOC. 21);**

**(2) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
(DOC. 28) & DENYING DEFENDANTS' MOTION FOR LEAVE TO FILE
A SUR-REPLY BRIEF IN OPPOSITION (DOC. 42); AND**

**(3) GRANTING IN PART DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT (DOC. 24)**

       This civil action is before the Court on three substantive motions:  (1) the motion

to dismiss for lack of subject-matter jurisdiction filed by Defendants CE Power Solutions,

LLC and CE Power Solutions of Florida, LLC (Doc. 21)[1] and the parties' responsive

memoranda (Docs. 25, 27[2] and 33); (2) Plaintiff Dean Technology, Inc.'s motion for

summary judgment (Docs. 28, 30[3]) and the parties' responsive memoranda (Docs. 37,

---

[1] This motion was filed under seal (*see* Doc. 22).

[2] Exhibit 5 to Plaintiff's memorandum in opposition was filed under seal (*see* Docs. 26, 31).

[3] The memorandum in support (including exhibits) of this motion was filed under seal (*see* Docs. 29, 32).

40[4]); and (3) the motion for partial summary judgment filed by Defendants CE Power Solutions, LLC and CE Power Solutions of Florida, LLC (Doc. 24)[5] and the parties' responsive memoranda (Docs. 34, 36[6], 38).  Also before the Court is the motion to file a sur-reply brief in opposition to Plaintiff's motion for summary judgment by Defendants CE Power Solutions, LLC and CE Power Solutions of Florida, LLC (Doc. 42) and the parties' responsive memoranda (Docs. 43, 44);

## I. DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION

Plaintiff invokes this Court's jurisdiction pursuant to 28 U.S.C. § 1332, averring that this civil action is one between citizens of different states with an amount in controversy that exceeds $75,000, exclusive of interests and costs.  (Doc. 1, Complaint ¶ 1.)  Defendants do not contest complete diversity, but argue that Plaintiff cannot satisfy the minimum amount in controversy.

### A. Allegations Contained within the Complaint

Plaintiff specializes in the manufacture, distribution and support of high voltage components, high current components, assemblies and power supplies.  It sells three main product lines, one of which is known as "CKE."[7]  (Doc. 1, Complaint ¶ 7.)  Defendants provide "electrical systems solutions" to their customers, which operate electric utility

---

[4] Plaintiff's reply memorandum was filed under seal (*see* Doc. 39).

[5] This motion was filed under seal (*see* Doc. 23).

[6] Exhibits 2, 3 and 14 to Plaintiff's memorandum in opposition were filed under seal (*see* Doc. 35).

[7] CKE is listed as "Vendor" on the three purchase orders attached to the Complaint as Exhibit 1and is described as a "Division of Dean Technology, Inc." on the three sales orders attached to the Complaint as Exhibit 2.

power plants, alternative energy facilities, transmission and distribution substations, and other facilities with critical power needs.  (*Id*. ¶ 8.)  The products required by Defendants to service their customers are specialized; lead time to assemble and ship them is a necessity.  To this end, then, Defendants (as buyer) used "blanket" purchase orders to identify in advance to Plaintiff (as seller) the products needed.  (*See id*. ¶ 10.)  The "blankets" required Plaintiff to maintain a certain amount of inventory consisting of parts and finished goods to be able to meet Defendants' shipping requirements.  (*Id*. ¶ 12.)  At issue are three particular blankets, identified as Purchase Order Nos. 19252 (issued in 2009), 20388 (issued in 2010) and 22130 (issued in 2011).  (*Id*. ¶ 16 & Exh. 1.)  Each of them contained quantity and price terms for the items identified, and, upon receipt of each of them, Plaintiff sent to Defendants a sales order in return.  A second sales order also was sent at the time of product shipment.  These sales orders included shipping and credit terms and incorporated by reference Plaintiff's "General Terms and Conditions of Sale."  (*Id*. ¶¶ 10-11, 13.)

Plaintiff maintains that the blanket purchase orders originated by Defendants and its corresponding sales orders constitute contracts.  Plaintiff was obligated to supply all products listed, and, in turn, Defendants were obligated to buy all products supplied.  (*Id*. ¶ 15.)  Plaintiff further maintains that Defendants have refused to accept and pay for approximately $100,000 of product ordered via the blankets.  (*Id*. ¶¶ 17, 18.)  Plaintiff sues under theories of breach of contract (*id*. ¶¶20-27) and promissory estoppel (*id*. ¶¶ 28-34).

**B. Standard of Review**

When considering a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, one of two standards may apply, depending on the nature of the challenge. *Golden v. Gorno Bros., Inc*. 410 F.3d 879, 881 (6th Cir. 2005).  If the challenge is directed to the *factual* basis for jurisdiction, the court must weigh the evidence presented and the *plaintiff* bears the burden of proof.  *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004).  But if the defendant challenges the court's subject-matter jurisdiction *on its face*, the court must, in effect, resolve the issue by applying the same standard applicable to a Rule 12(b)(6) motion—that is, treating all of the facts alleged in the complaint as true.  *See id.*  Here Defendants' challenge is quite obviously a "factual" attack and, therefore, evidence beyond the Complaint will be considered.

"If a claim of the required jurisdictional amount is apparently made in good faith, that claim controls unless it appears 'to a legal certainty that the claim is really for less than the jurisdictional amount.'"  *Jones v. Knox Exploration Corp.*, 2 F.3d 181, 182 (6th Cir. 1993) (quoting *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938)).  If the evidence adduced at trial "'conclusively show[s] that the plaintiff never had a claim even arguably within the [required] range,' a diversity action must be dismissed."  *Id*. (quoting *Jimenez Puig v. Avis Rent-A-Car Sys.*, 574 F.2d 37, 39 (1st Cir. 1978)).  *A fortiori*, the same conclusion must attend if such a revelation occurs during pre-trial discovery.

### C. Analysis

Defendants dispute that the blankets and corresponding sales orders create three separate contracts.  Assuming they do, however, Defendants urge that the maximum amount Plaintiff could recover is governed by what they identify as the "liquidated damages" provision set forth in Section 2.f.2. of the General Terms and Conditions of Sale.  That specific provision, and surrounding provisions helpful to provide context, read as follows:

2.  ORDERS
. . . .

    f.  Cancellation of Orders.

        1.  Standard Products.  If Customer cancels an order for Standard Products prior to initial shipment of any portion of such order, Seller may charge Customer Seller's then effective re-stocking fee.

        2.  **Specialty Products.  For any Specialty Products** or Overseas Order, **cancellation charges shall be equal to the sum of (i) the cost of the actual materials purchased, labor and overhead incurred by Seller to (a) manufacture such Specialty Products** or (b) modify a Standard Product to cause the same to constitute a Specialty Product, as applicable, **plus (ii) 30% of the costs described in clause (i) preceding.**

        3.  Cancellation Restrictions.  Notwithstanding the provisions of clauses (1) and (2) above to the contrary, **there shall be no cancellation of any order within thirty (30) days of any proposed shipping date**.  Any pre-paid fees, costs or expenses already received by Seller with respect to any canceled order shall be retained by Seller to compensate Seller for expenses incurred by Seller with respect to such cancelled order.

    . . . .

(Doc. 1, Complaint, Exh. 3 at 3 (emphasis added).)

Craig Dean testified on behalf of Plaintiff.[8]  He stated that nearly all the products that Defendants refused to purchase were "custom products made to CE Power's designs[]" (Dean tr. at 50-51 (Doc. 21, Exh. A)), and thus would qualify as "Specialty Products" as identified in the Terms and Conditions (*see id.* at 180).  Dean also testified as to:  (1) the total cost for products manufactured for Defendants that they refused to purchase;  as well as (2) the total cost for component parts purchased for products that Plaintiff had not yet manufactured and were refused by Defendants.  (*See id.* at 290-91, 297-98, 307-08 & Defendants' Depo. Exh. 61.)  Combined, these figures equal $29,002.61.  That amount, plus 30% of that amount ($8,700.78), yields a sum of $37,703.39.  Accordingly, Defendants take the position that the maximum amount of damages for breach of contract that Plaintiff could recover is $37,703.39, a figure far less that the requisite $75,000.

Plaintiff counters that Section 2.f.2. is inapplicable, insisting that it is triggered *only* when there has been a cancellation to which the parties have *agreed*.  Moreover, Plaintiff underscores the testimony of Defendants' representatives who stated that the orders at issue were *not* cancelled.[9]  Yet even if Section 2.f.2. were applicable, Plaintiff maintains that Section 2.f.2. is *not* a liquidated damages clause and, regardless, is a "non-exclusive" remedy.  For all these reasons, Plaintiff believes that it is entitled to recover

---

[8] Dean was designated as Plaintiff's witness pursuant to Fed. R. Civ. P. 30(b)(6).  (Dean tr. at 1 (Doc. 21, Exh. A).)

[9] Testifying on behalf of CE Power Solutions was its President, William McCloy, who was designated as one of its Rule 30(b)(6) witnesses.  (McCloy tr. at 1, 21, 179, 183-84, 219-20 (Doc. 25, Exhibit 2). )  Testifying on behalf of CE Power Solutions of Florida was its former General Manager and part owner Gregory Martin Watson.  (Watson tr. 16, 127-28 (Doc. 25, Exh. 3).)

the full panoply of damages attendant to a breach of contract, which includes not only costs incurred but also profits lost. *See* Ohio Rev. Code § 1302.82(B) (UCC 2-708). And if lost profits are potentially recoverable, the jurisdictional threshold is clearly satisfied.

The Court observes that Defendants point to no provision within the Terms and Conditions that allows them a unilateral right of cancellation. Defendants obviously seek to imply one through the language of Section 2.f.2., but fail to cite to any Revised Code section or Ohio case law that would permit such an interpretation. The testimony presented to the Court confirms that no *overt* cancellation occurred. Defendants argue, however, that their action—or, more precisely, inaction (a refusal to accept delivery of, and pay for, the specialty products that Plaintiff claims they ordered)—amounted to a *de facto* cancellation sufficient to trigger Section 2.f.2. (*See* Doc. 33, reply brief at 4 ("[W]hile CE Power may not have used the term 'cancellation,' the undisputed evidence shows that it cancelled the orders for any products that were identified in the blankets and not previously purchased.").) Defendants' argument is unavailing, however.

Review of the three blankets and corresponding sales orders reveals an apparent level of give-and-take between the parties with respect to cancellation. For example, Line 5 of PO Number 20388 lists Part Number BHD1206-1125, with an Order Qty. of 8.00 (altered by hand to "6") and the following legend: "THE REMAINING QUANTITY OF 8 FROM BLANKET PO 18488 **IS TO BE CANCELLED** AND QUANTITY IS TO BE MOVED TO THIS PO[.]" (*See* Doc. 1, Complaint, Exh. 1 at 4 (emphasis added).) The corresponding Sales Order 33255 lists (on its line 5) the same part number and quantity, presumably an acceptance by the seller of the cancellation

7

proposed by the buyer.  (*See id.*, Exh. 2 at 2.)  Of course, one might question whether

transfer of an order of eight pieces from one purchase order to another is a "cancellation"

at all.[10]  Nonetheless, this written exchange suggests a deliberate process regarding

cancellation, [11] inconsistent with the notion that it could occur by default.

---

[10] Attached as an exhibit to Defendants' memorandum in opposition to Plaintiff's motion for summary judgment (Doc. 37) is the following testimony of John Czeck, an outside sales representative for Dean Technology, on this very subject:

> Q.  So in this instance you're telling – you're informing CE Power that it was acceptable to cancel some of the products that were listed in a blanket, correct?
> . . . .
> A.  If you read these paragraphs separately and treat them as individually, the first item was the SD32A, yes, I am saying you can cancel the 14 pieces of that part.  But if you read the next sentence it states, "But I need you to add these 14 pieces to the new blanket purchase order . . . . So what I'm saying there is – **I'm not telling them I'm authorizing cancellation of the purchase order, what I'm saying is, we are authorizing those said quantities in return of an off-setting order as stated in the e-mail.**

(Czeck tr. at 90-91, 176 (Doc. 37, Exh. E (emphasis added)).)

[11] Attached as an exhibit to Defendants' memorandum in opposition to Plaintiff's motion for summary judgment (Doc. 37) is the following testimony of Craig Dean regarding cancellation:

> Q.  So in this particular instance, CE Power was cancelling an amount of a product on a prior blanket, correct?
> A.  **They were requesting to cancel an amount** on a prior blanket and replace it with this blanket.
> Q.  Okay.
> A.  **It's not accepted until we've provided them a confirming if we accepted that or not**.
> Q.  Do you recall whether you –
> A.  We always sent a confirming.  You would have to look at the confirming order.  **If you have the confirmings, I can tell you if we did accept this or not**.
> . . . .
> Q.  **You would agree that Section 2f** of the Terms and Conditions applies to or **gives customers a right to cancel** under certain conditions, correct?
> A.  **Only if accepted by us**. . . .
> Q.  **Where does it say that the seller must agree to a cancellation in Section f** of the Terms and Conditions?
> A.  **It does not say that**.
> . . . .
> Q.  So as we sit here today, it's Dean Technology's position that CE Power has not informed Dean Technology that it won't purchase the items?
> A.  They said they won't take the releases and they won't pay me, but **they never once said**, "I'd like to cancel this order.  **Can we negotiate a cancellation?  Can we reach an agreement** [?]"

(Dean tr. at 156-57; 176; 299 (Doc. 37, Exh. A (emphasis added).)

On balance, and presuming a contractual relationship for purposes of resolving Defendants' jurisdictional challenge, a sequence of questions attend the issue.  First, whether Defendants had the right to unilaterally cancel the orders begins the inquiry.  If not, then Plaintiff—because there has been a breach as opposed to a cancellation— hypothetically would not be limited to the damages set forth in Section 2.f.2. and the jurisdictional threshold would be satisfied.  But supposing Defendants did have the right to unilaterally cancel, there remains the follow-up question of whether Defendants actually cancelled the orders.  If not, then, again, Plaintiff hypothetically would not be limited to the damages set forth in Section 2.f.2. and the jurisdictional threshold would be satisfied.  *Only if* the answer is "yes" to this second question would the amount in controversy fall below $75,000.00, and that conclusion assumes Section 2.f.2. to be an *enforceable* and *exclusive* liquidated damages clause under Ohio law.  Against this backdrop, Defendants clearly have not shown to a "legal certainty" that Plaintiff cannot recover lost profits in connection with the breach of contract claim pled in its Complaint.  *See Charvat v. NMP, LLC* 656 F.3d 440, 447 (6th Cir. 2011) (applying *St. Paul Mercury*, *supra*, 303 U.S. at 289)).  Accordingly, Defendants' motion to dismiss for lack of subject-matter jurisdiction is DENIED.

## II.     THE MOTIONS FOR SUMMARY JUDGMENT

Plaintiff has moved for summary judgment as to both liability and damages.  It maintains that no genuine issue of material facts exists with respect to the enforceability of the parties' agreements and that it is entitled to judgment as a matter of law for

Defendants' breach of contract.  It seeks damages, which include lost profits, of $82,050.69.

Defendants have not filed a cross motion for summary judgment on the issue of liability.  Rather, they maintain that a question of material fact exists as to whether the three blankets and confirming sales orders constitute binding contracts.  Defendants have moved for partial summary judgment, however, on four other issues.  Defendant CE Power Solutions asks the Court for summary judgment in its favor on the theory that any dealings Plaintiff had with respect to the products at issue were solely with Defendant *CE Power Solutions of Florida*.  Further, Defendants ask the Court to grant them summary judgment as to Plaintiff's prayer for an award of attorneys' fees.  In addition, Defendants request that the Court hold as a matter of law that Plaintiff's damages are limited to a maximum of $37,703.39 and that Plaintiff has failed to mitigate its damages.

## A.  Relevant Facts

At some point in their business relationship, the traditional practice of issuing a purchase order and receiving immediate shipment of products stopped working for the parties.  It became difficult for Plaintiff to supply products in a timely fashion, an absolute necessity given Defendants' customer base.  As a solution, the parties agreed that Defendants would begin to issue blanket purchase orders to Plaintiff in the hopes that this new practice would allow Plaintiff to remain one of their suppliers.  (*See* Dean tr. at 102, 115-16 (Doc. 37, Exh. A); Watson tr. at 107 (Doc. 37, Exh. B); McCloy tr. at 99 (Doc. 40, Exh. 6) & at 82, 111 (Doc. 37, Exh. D).)  The blankets in dispute list specific item numbers, quantities and price terms.  But the "Shipping Release Requirement" refers

to future "multiple release requests" and "multiple ship dates" to be triggered by the issuance of a "new purchase order number."[12]

William McCloy, President of CE Power Solutions, described the blankets as merely "forecasts" designed to help Dean Technology manage its inventory.  As such, he believed that they did *not* create an obligation on Defendants' part to purchase all the items listed.   (McCloy tr. at 81-82, 111, 114 (Doc. 37, Exh. D).) Defendants' obligation to purchase arose *only* after they issued a "new purchase order" that contained a specific ship date with regard to some portion of the specific products listed on the blanket.  And the obligation to purchase attached *only* to the number of goods listed on the "new" order.

Craig Dean agreed that the blankets helped with inventory.[13]  But the new

---

[12] The following language appears at the bottom of PO Number 19252 under the caption "Shipping Release Requirement":

> THESE ITEMS ARE FOR A BLANKET ORDER THAT WILL HAVE **MULTIPLE RELEASE REQUESTS** AGAINST IT AND **MULTIPLE SHIP DATES**.  SINCE THAT IS THE CASE NO DUE DATES HAVE BEEN ENTERED ON THE P.O.  **A NEW PURCHASE ORDER NUMBER WILL BE ISSUED FOR EACH RELAESE AGAINST THIS BLANKET ORDER WHEN THE REQUIREMENT FOR SAID COMPONENTS IS NEEDED** TO CE POWER SOLUTIONS LLC.

(Doc. 1, Complaint, Exh. 1 (PAGEID #: 10) (emphasis added).)

The phrase "multiple release" likewise appears in the various notations contained in the "Shipping Release Requirements" under each line item listed on PO Number: 20388.  (*See id.* (PAGEID ##: 11-12).)

[13]Dean testified:
> Q. And at that time Dean [Technology] would use the blanket to determine how to stock the inventory?
> A. On the blankets it would tell us what they required us to have in stock, and we would immediately order any long lead time items for the entire blanket.
> Q. And that was so you would have them available when CE Power came calling on you at a later date?
> A. Yes, we could offer a reduced lead time or a stock delivery.

(Dean tr. at 118 (Doc. 37, Exh. A).)

purchase orders functioned simply as "releases" off the blankets.[14]  Like any other

customer, Defendants were obligated to eventually purchase the "total volume" of goods

listed on the blanket.  A blanket simply allowed Plaintiff the opportunity to give its

customer, Defendants included, "the volume price for a smaller volume of releases" and

"to stock a committed amount of finished goods based on the customer's needs."  A

blanket served to "ensure the price and ensure quick delivery."  (*See* Dean tr. 113 (Doc.

37, Exh. A).)  All items on a blanket were expected to be released "inside of 12 months."

(*See id.* at 114).  Plaintiff sometimes was lenient and allowed a customer to go 18

months, but, after 24 months, that customer would be pressured to "schedule a release."

(*Id.*)

## B.  Standard of Review

A motion for summary judgment should be granted if the evidence submitted to

the Court demonstrates that there is no genuine issue as to any material fact, and that the

movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  *See Celotex*

---

[14]Dean testified:

> Q. How did Dean know when to ship each product?
> A. CE Power would send in a release.  The way they wanted it [to] work specifically with CE Power is, they sent it in as a new order and then we were to reduce the blanket by that quantity, because CE Power had an internal need to track every shipment with their customer's jobs.  And because they used an order that was a blanket, that number didn't match the customer's specific job.  So every time there was a release they sent it in as a new order, and we then [] would reduce the blanket by that amount.
> Q. So the blanket would come in, and then at a later date CE Power would place a new order, as you said?
> A. We call it releases.
> Q. What did CE Power call it, a new order?
> A. They called it a purchase order.
> Q. Okay.
> A. But it was intended to be a release against the blanket, and it would say on there "release against blanket."

(Dean tr. at 118 (Doc. 37, Exh. A).)

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (1986).

The parties agree that Ohio law governs in this diversity action.

**C. Analysis**

**1. Plaintiff's Motion for Summary Judgment**

Plaintiff maintains that the seminal issue this Court must consider is "whether the [Blanket] Purchase Orders and confirming Sales Orders exchanged by the parties obligate [Defendants] to purchase the specially manufactured goods ordered by [Defendants]." (Doc. 30, memorandum in support at 5.)  The Court concludes that questions of material fact surround this inquiry, rendering summary judgment unavailing.

It is true that blanket purchase orders are frequently enforced by Ohio courts.  *See, e.g.*, *NTX, Inc. v. CAS of New England*, No. 97923, 2012 WL 6822008 (Ohio App. 8 Dist. Dec. 13, 2012); *SST Bearing Corp. v. Twin City Fan Cos. Ltd.*, No. C-110611, 2012 WL 2053315 (Ohio App. 1 Dist. June 8, 2012); *NSK Indus., Inc. v. Bayloff Stamped Prods. Kinsman, Inc.*, No. 24777, 2010 WL 1052261 (Ohio App. 9 Dist. Mar. 24, 2010); *Kidron,*

*Inc. v. Simon-Duplex, Inc.*, No. 2000AP030028, 2000 WL 1335076 (Ohio App. 5 Dist. Sept. 13, 2000).[15] Key, of course, is whether the blanket purchase orders contain all of the essential contract terms. The blanket purchase orders here identify the parties (that is, the buyer and the seller), specific part numbers, specific quantities and a price per unit. What they lack most prominently is a specific ship date. They also are completely silent as to an overall time frame vis-à-vis the "multiple release requests."

Plaintiff relies heavily on *Kidron*. There, the buyer issued an annual blanket purchase order, which specified an approximate range of the number of truck cabs (anywhere from seven to twelve) that it would purchase from the seller per month. In the fourth year of their arrangement, the buyer advised the seller that it was closing its business and cancelled the remainder of its order. Summary judgment was awarded to the seller. On appeal, the buyer argued that the blanket purchase order did not constitute a binding agreement, in part because separate and subsequent purchase orders were used to direct the monthly release and shipment of the truck cabs. The appellate court affirmed, ruling that "the fact that the agreement stated that a separate purchase order

---

[15] Defendants cite two cases to the contrary, but neither is apposite. In *Harris Thomas Indus., Inc. v. ZF Lemforder Corp.*, the blanket purchase order made "clear" that the "target quantity/estimated annual usage" was nothing more than an "estimate," with the parties agreeing that the releases "governed the *quantity* and dates of delivery." No. 3:06CV190, 2007 WL 3071676, at *3 (S.D. Ohio Oct. 19, 2007) (Ovington, M.J.) (emphasis added). Here, *whether* the releases govern is at the very heart of the dispute between the parties. And, in the Sixth Circuit case relied upon in *Harris Thomas*, the "request for quotation" submitted by the buyer to the seller (*preliminary* to release of a blanket purchase order) included the part name and number and "an estimate of yearly usage." *Advanced Plastics Corp. v. White Consolidated Indus., Inc.*, No. 93-2155, 1995 WL 19379, at *1 (6th Cir. Jan. 18, 1995) (*per curiam*). In addition, the "request for quotation" included this disclaimer: "Estimated yearly usage is *estimate only*. Do *not* construe as firm commitment." *Id.* at *2 (emphasis added). Finally, at issue in the second case cited was whether buyer and seller "were intended parties to a single *requirements* contract." *Goodyear Tire and Rubber Co. v. Chiles Power Supply, Inc.*, 7 F. Supp. 2d 954, 960 (N.D. Ohio 1998) (emphasis added). No such allegation has been made in this litigation.

would be issued for each cab does not render the agreement invalid."  2000 WL 1335076, at *4.

The facts of this case are indeed quite similar, and, at first blush, seem even more compelling inasmuch as the quantity term in *Kidron* was a range whereas, here, the quantity term is exact.   But there is one significant and determinative difference.  Despite the integration clause that was printed on the back of the blanket purchase order, the trial court concluded that the agreement between the parties was only partially integrated. Thus, the court considered, as part of its summary judgment deliberations, affidavits from the negotiating agents of both the seller and the buyer as evidence of consistent additional terms pursuant to Ohio Rev. Code. § 1302.05(B) (UCC 2-202).  *See Camargo Cadillac Co. v. Garfield Enterprises, Inc.* (1982), 3 Ohio App. 3d 435, 437, 445 N.E.2d 1141, 1144 (Black, J.).  Their testimony was consistent—and thus the evidence was undisputed—that the parties had agreed that "if [the buyer] canceled or reduced quantities of truck cab orders, and [the seller] had purchased materials in reliance on the projection of cabs as set forth in the blanket purchase order, [the buyer] would pay [the seller] for such materials."  On this basis, then, the appellate court affirmed the trial court's entry of summary judgment in favor of the seller.  *Kidron*, 2000 WL 1335076, at *3.

This Court similarly concludes that here the purported agreements between Dean Technology and the CE Power Defendants are only partially integrated.   No integration clause of any sort appears on the blanket purchase orders or the confirming sales orders or within the seller's General Terms and Conditions of Sale.  Thus, the "four corners" of the writings would suggest less than full integration, as does the conflicting testimony of

Dean and McCloy about the parties' intentions—that is, the purpose of these blanket purchase orders.  As a result, the terms found within the blanket purchase orders and confirming sales orders can be explained or supplemented (but not contradicted) both by a course of dealing, usage of trade or course of performance *and* by evidence of consistent additional terms.  *Camargo Cadillac*, 3 Ohio App. 3d at 438-39, 445 N.E.2d at 1145 (construing § 1302.05).[16]  But, in contrast to *Kidron*, the extrinsic evidence here would allow a trier of fact to decide either way.  To cite but one example, a trier of fact might conclude that Plaintiff's willingness to "cancel" items ostensibly "ordered" on one blanket, and roll them over to another, is evidence that they actually were intended to be estimates only.

Because summary judgment is not indicated with respect to liability, the Court need not consider summary judgment with regard to damages.  Plaintiff's motion for summary judgment is therefore DENIED.

### 2.  Defendants' Motion for Partial Summary Judgment

### a.  Liability of Defendant CE Power Solutions, LLC

Plaintiff has sued both CE Power Solutions, LLC and CE Power Solutions of Florida, LLC.  The former ("CEP Solutions") seeks judgment as a matter of law on the issue of liability, arguing that any contracts formed were between Plaintiff and CE Power Solutions of Florida ("CEP Florida") *only*.  In support, CEP Solutions references the

---

[16] In its reply in support of its motion for summary judgment, Plaintiff argues that introduction of any evidence regarding whether the blankets were intended as "estimates" is barred by the parol evidence rule (Doc. 40 at 7-9).  Plaintiff is wrong.  As the Court needs no further briefing on this issue, Defendants' motion for leave to file a sur-reply (Doc. 42) is DENIED.

testimony of Craig Dean (*see* Dean tr. at 153 (Doc. 24, Exh. A)) and John Czech (*see* Czech tr. at 127-29 (*id.*, Exh. E)).  The Court is not persuaded.

All three blankets display a "CE Power Solutions" logo.  PO Numbers 19252 and 20388 list "CE Power Solutions of Florida" as the originator, with a Cincinnati, Ohio address.  "CE Power Solutions of Florida" is listed as the recipient of the goods in the "Ship To" box, with a Lake Hamilton, Florida address underneath.  The last line of the purchase orders directs CKE as follows:

> Please send a hard copy confirmation of this order to the above email address or fax it to 513.563.6120.[17] If you have any questions regarding this order please call immediately.  Thank you.

The email address listed on the top right of the blankets is www.cepowersol.com.  PO Number 22130 (on a "Material Requisition Form") lists "CE Power Solutions" as the originator, with a Lake Hamilton, Florida address underneath.  The "Ship To Location" line is blank.  (*See* Doc. 1, Complaint, Exh. 1.)  All three confirming sales orders (31299, 33255 and 36729) list "CE Power of Florida, LLC" with a Cincinnati, Ohio address as the "Bill To" entity and "CE Power of Florida, LLC" with a Lake Hamilton, Florida address as the "Ship To" recipient.  (*See id.*, Exh. 2.)  Five invoices for payment—regarding goods "released" off these blankets—have been submitted on this issue.  On each of them, "CE Power of Florida, LLC" with a Cincinnati, Ohio address is listed as both the purchaser and shipping recipient.  (*See* Invoice Nos. 40670, 43749, 43750, 48348 and 75537 (Doc. 34, Exh. 7).)

---

[17] This fax number belongs to CEP Solutions, not CEP Florida.  (*See* Doc. 34, Exh. 5.)

Craig Dean testified that Plaintiff understood, at all times, that its "contracts" were with both CEP Solutions and CEP Florida.  (Third Affidavit of Craig Dean ¶ 8 (Doc. 34, Exh. 1).)  CEP Solutions argues that this testimony by affidavit should be disregarded, asserting that it contradicts his prior deposition testimony.  The Court has reviewed Dean's deposition testimony in context, and does not agree that such a clear-cut contradiction exists.  Nor is the Court satisfied that John Czech's testimony is as definitive as CEP Solutions paints it to be.  Regardless, the mix-and-match of addresses and phone numbers on the documents exchanged suggests that both parties may be liable.

With respect to the first two blankets, no explanation has been provided as to why order confirmations would be emailed or faxed to CEP Solutions if that entity did not have some (or all) responsibility for paying for the products ordered.  As to the third blanket, Plaintiff's agent John Czeck testified that he was the individual who listed out the items appearing on the Material Requisition Form by way of memorializing his meeting with CEP Florida employees in their Lake Hamilton, Florida office.  (Czech tr. at 126-27, (Doc. 24, Exh. E).)  But that form contains not only the CEP Solutions logo at top left, but also the title "CE POWER SOLUTIONS" at top right.  And although the Lake Hamilton, Florida address appears thereunder, notably the modifier "of Florida" does not.  (Doc. 1, Complaint, Exh. 1 at 5.)  Moreover, Czech testified, without contest by Defendants, that the signature approving the "order" belongs to Jason Babington, a CEP Florida employee.  (Czeck tr. 127 (Doc. 24, Exh. E).)  Presumably Mr. Babington had the opportunity to clarify the identity of the party in whose interest he was acting, assuming it was *not* CEP Solutions.

Without a doubt, the imprecision of the paperwork exchanged highlights a question of material fact as to whether both entities are parties to these purported contracts with Dean Technology.  So, too, do the emails exchanged between Kathy Foster, an employee of CEP Solutions (Deposition of Kathy Foster at 48 (Doc. 40, Exh. 4)), and Pam Brank, Inside Sales Manager at Dean Technology.  Foster wrote initially:

> Please do not accept any orders **from CE Power** without a current PO,
> Do not use any blanket PO's on any orders;
> **We have processes in place,** and I understand that **our employees did not follow the processes** . . .

(Deposition Exhibits at 5 (PAGEID #: 1061) (Doc. 37, Exh. G) (emphasis added).)  Then, as a follow-up:

> CKE must have a PO other than the blanket to process an order, they are not ever supposed to use the job number in place of a PO, they know that, **I know this is our problem**, but I need CKE to push back to make sure a PO is on **our packing slips & invoicing so you will get paid properly.  Our PO System in place has to be used**, it is not difficult, that is why if you have any problems contact Drew, and he will get you a PO quickly.

(*Id.* at 4 (PAGEID #: 1060) (emphasis added).)  It is unclear to the Court, if CEP Solutions is *not* a party to these alleged agreements, why its employee—designated as one of its Rule 30(b)(6) witnesses—would be sending emails to Plaintiff with directions regarding invoicing and payment.  (*See* Foster tr. at 1 (Doc. 40, Exh. 4).)  Accordingly, Defendant CEP Solutions motion for judgment as a matter of law on liability[18] is DENIED.

---

[18] The Court's reasoning applies fully to Plaintiff's alternate claim of promissory estoppel.

**b. Recovery of Attorneys' Fees**

Plaintiff's Complaint seeks an award of attorneys' fees. (Doc. 1 at 7.) Defendants argue that such an award would be at odds with the American Rule. *Wilborn v. Bank One Corp.*, 121 Ohio St. 3d 546, 548, 2009-Ohio-236, 906 N.E.2d 396, 400 ¶ 7. And while the right to recover attorneys' fees may arise from a stipulation in a contract, it can do so only if, among other things, there is "[t]he presence of equal bargaining power." *Id.* at 549, 906 N.E.2d at 399, ¶ 8. Furthermore, there must be evidence that the parties specifically negotiated the provision; a preprinted clause appearing within a standard form will not be enforced. *Vistein v. Am. Registry of Radiologic Technologists*, 342 Fed. App'x 113, 124 (6th Cir. 2009) (*per curiam*).

Craig Dean testified that Plaintiff seeks an award of attorneys' fees based on Section 9.d. of its General Terms and Conditions of Sale, which reads as follows:

> Indemnity. Customer shall indemnify Seller from and against any and all losses, costs, Damages, and liabilities suffered by Seller as a result of any breach by Customer of any of the representations or warranties set forth above.

(Doc. 1, Complaint, Exh. 3 at 8.) Defendants argue that Plaintiff cannot rely on this provision because it has not alleged a breach of any representation or warranty. Moreover, the provision does not specifically mention "attorneys' fees" or other such language as required under Ohio law. *See Continental Tire N. Am. v. Titan Tire Corp.*, No. WM-09-010, 2010 WL 1223981, at *10 (Ohio App. 6 Dist. Mar. 31, 2010). Finally, this provision appears within the standard "Terms and Conditions" referenced on Plaintiff's confirming sales order, and there is no evidence that the parties "negotiated the boilerplate." *Vistein*, 342 Fed App'x at 124.

Plaintiff does not dispute these principles of Ohio law, and the Court finds that any arguments to the contrary are not well-taken. As a matter of law, then, Plaintiff cannot recover attorneys' fees as damages should it prevail on its breach of contract claim.[19] Therefore, on this particular issue, Defendants' motion is GRANTED.

### c. Whether Section 2.f.2. Limits the Damages Plaintiff Can Recover

Defendants reprise their argument concerning the applicability of Section 2.f.2. as a liquidated damages clause. They ask the Court to rule as a matter of law that, presuming the existence of binding agreements, the maximum amount Plaintiff can recover is $37,703.39. Once again, Plaintiff counters that Section 2.f.2. is inapplicable. But even if it were, it is not a liquidated damages clause and, in any event, is not an exclusive remedy.[20]

---

[19] Should this matter proceed to trial and judgment be entered in favor of Plaintiff, this ruling should not be interpreted as precluding Plaintiff from seeking attorneys' fees on the theory that Defendants have litigated this matter in bad faith. (*See* Doc. 34 at 7.) On the question of whether Defendants have filed meritless and redundant motions, however, Plaintiff is cautioned. It is true that motion practice has been vigorous and there is obvious overlap between Defendants' motion to dismiss for lack of subject-matter jurisdiction and that portion of their motion for partial summary judgment that relates to Section 2.f.2. The Court concludes, however, that the positions taken *thus far* fall within the bounds of advocacy.

Of greater concern to the Court is the seemingly uncontested accusation of John Czech. He avers that, during a phone call on January 28, 2014, William McCloy (CE Power Solutions' President) complained about the pending litigation and called him a "fucking piece of shit" and stated that he was going to "personally fucking destroy" him and Dean Technology. (Affidavit of John Czech ¶¶ 3-5 (Doc. 34, Exh. 8).) McCloy promised to spread the word in the industry about what a "fucking piece of shit" Czech is, and what a "fucking piece of shit" Dean Technology is. (*Id.* ¶ 6.) McCloy also threatened to contact certain individuals identified on Plaintiff's witness list. (*Id.* ¶ 7.) Czech deposed that he personally did not take any legal action as a result of this phone call or a previous one that occurred prior to the filing of the Complaint. (Czech tr. at 198-99 (Doc. 34, Exh. 9).)

On the topic of McCloy's "threat to contact" Plaintiff's witnesses, counsel are admonished, in the exercise of their professional responsibility, to investigate and consult with each other concerning any claims of intimidation and, if warranted, bring them to the Court's attention—by subsequent motion—forthwith.

[20] Plaintiff additionally contends that Defendants were obligated to raise this issue as an affirmative defense in their Answer, and, having not done so, have waived any argument relating thereto. The Court finds this contention to be without merit and declines to further address it.

Section 2 of the Terms and Conditions governs "Orders," with Part f addressing "Cancellation of Orders" and Subpart 2 describing how charges therefor shall be computed with regard to specialty products.  On its face, Section 2.f.2. clearly does not reference "breach" or "failure to perform" or any other such terminal event.  Thus, as a matter of law, the Court concludes that Section 2.f.2. applies only to cancellations, however defined.  *See Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St. 2d 241, 374 N.E.2d 146, syl. ¶ 1, *superseded by statute on other grounds.*

Defendants proceed on the premise that their refusal to purchase the products listed on the blankets is tantamount to a "cancellation" such that Section 2.f.2. is triggered.  But their presumption is improper.  A question of material fact exists as to whether Defendants' conduct can be so characterized.  And only after that finding is made does the hypothetical—set forth in this Court's discussion analyzing the amount in controversy issue (*see* p.9, *supra*)—begin to play out.  If the trier of fact finds that Defendants' refusal to take any further "releases" off the blankets is *not* a cancellation, then, as a matter of law, Plaintiff would be entitled to the damages allowable under Ohio Revised Code § 1302.82(B)  (UCC 2-708).  But if the trier of fact eventually determines that a cancellation *did* occur, the question remains as to whether Section 2.f.2. limits the amount of damages that Plaintiff can recover.  This inquiry is two-fold, asking first whether Section 2.f.2. is an enforceable liquidated damages clause, and, if so, whether it is an exclusive remedy.

Under certain circumstances, liquidated damages provisions in commercial contracts are enforceable in Ohio.  *Samson Sales, Inc. v. Honeywell, Inc.* (1984), 12 Ohio

St. 3d 27, 28, 465 N.E.2d 392.  A court must apply a three-part test that asks: (1) whether the damages are uncertain and difficult to prove; (2) whether the provision is unconscionable, unreasonable or disproportionate to the actual damages; and (3) whether "the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof."  *Id.*, 465 N.E.2d at 393 (quoting *Jones v. Stevens* (1925), 112 Ohio St. 43, 146 N.E. 894, syl. ¶ 2)).  This tripartite test is noticeably conjunctive, requiring that all three elements be met.[21]  *Kurtz v. Western Property, L.L.C.*, No. 10AP-1099, 2011 WL 6916196, at *6 (Ohio App. 10 Dist. Dec. 27, 2011) (quoting *Zurich-American Ins. Co. v. Citadel Alarm, Inc.*, No. 50499, 1986 WL 5291, *4 (Ohio App. 8 Dist. May 8, 1986)).

Plaintiff urges that none of the prongs can be satisfied, much less all three. Plaintiff maintains that its damages are easily determined and, indeed, have been calculated "to the cent--$82,050.69[]" (*see* Doc. 25 at 7; Doc. 34 at 12).[22]  Defendants counter that Plaintiff's ability to calculate its damages *today* is irrelevant to the inquiry about whether its damages were "uncertain" *at the time it accepted* each of the blanket purchase orders, noting that there could be a lag time of "years" before they might request shipment of the specialty products listed (*see* Doc. 38 at 13).  Additionally,

---

[21] This Court takes no position on which party bears the burden of proof.  *See Kehoe Component Sales, Inc. v. Best Lighting Prods.*, 933 F. Supp. 2d 974, 998 n.21 (S.D. Ohio 2013 ) (Sargus, J.).

[22] This sum adds together:
- $8,716.27 for the cost of goods manufactured in reliance on the blankets submitted by Defendants that still remain in inventory; plus
- $20,061.47 for the cost of the piece parts purchased to manufacture (additional) goods in reliance on the blankets submitted by Defendants that still remain in inventory; plus
- $53,272.95 in lost profits.

Doc. 25, Exhibit 5 (filed under seal) and Exh. 6, Affidavit of Craig Dean at ¶¶ 3-5.

Plaintiff contends that to "shoehorn" a liquidated damages provision into Section 2.f.2. would unreasonably deny it the ability to recover lost profits as allowed under Section 1302.82(B) (*see* Doc. 34 at 12).  Plaintiff notes that the term "liquidated damages" does not appear in Section 2.f.2. (or anywhere within the Terms and Conditions) and there is no evidence that the parties ever negotiated Section 2.f.2. as a liquidated damages clause.

An elaborate analysis under *Sampson Sales* is not necessary.  Section 2.f.2. refers only to "cancellation charges" that "shall be equal" to a particular sum -- nothing more.  Language this bare simply cannot be interpreted as a provision intended by the parties (in this case, by Plaintiff, the drafter of the boilerplate) to provide a limitation on damages.

Further, even if the language were to pass muster, palpably absent is any reference to exclusivity of remedy.[23]  Defendants claim that parties to a contract with a liquidated damages provision *ipso facto* cannot seek other remedies, citing *DeLorean Cadillac, Inc. v. Frazier*, No. 39009, 1979 WL 210253, at *7 (Ohio App. 8 Dist. July 19, 1979).  This unpublished appellate court decision has not been cited as authority by any other Ohio court, or by any federal court interpreting Ohio law, and seemingly stands alone in its view of Ohio Rev. Code §1302.93 (UCC 2-719).

Ohio Rev. Code §1302.93 addresses "Contractual modification or limitation of remedy" and reads as follows:

(A)     Subject to the provisions of divisions (B) and (C) of this section and of section 1302.92 of the Revised Code on liquidation and limitation of damages, both of the following apply:

---

[23] This question did not present itself in *Samson Sales*.  12 Ohio St. 3d at 28, 465 N.E.2d at 393, syl. ¶ 4 ("It is agreed . . . [that] . . . Company's liability, if any, shall be limited to the sum of Fifty Dollars ($50.00) as liquidated damages and not as a penalty *and this liability shall be exclusive*.") (emphasis added).

(1)  The agreement may provide for remedies in addition to or in substitution for those provided in sections 1302.01 to 1302.98 of the Revised Code and may limit or alter the measure of damages recoverable under such sections . . . .

(2) **Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy**.

. . . .

(Emphasis added.)  The *DeLorean* court understands the antecedent clause, "*Subject to the provisions . . . of section 1302.92 of the Revised Code on liquidation and limitation of damages*" to mean "Except when the parties have agreed to liquidate their damages." Yet such a narrow construction undermines the directive that subsection (A)(2) "creates a **presumption** that clauses prescribing remedies are **cumulative rather than exclusive**. **If the parties intend the term to describe the sole remedy** under the contract, **this must be clearly expressed**." *Id*., cmt.2 (emphasis added).   Because the *DeLorean* holding fails to give effect to the plain statutory language specifying that remedies are "optional" unless "expressly agreed to be exclusive," this Court declines to apply it to the facts of this case.[24]

In sum, the Court determines that Section 2.f.2. is neither an enforceable liquidated damages clause nor an exclusive remedy.  Accordingly, should the trier of fact conclude that there has been either a breach, or a cancellation, Plaintiff's recovery is not limited to $37,703.39.  In this respect, then, Defendants' motion for summary judgment is DENIED.

---

[24] The construction is also contrary to Ohio common law.  *See Bank One, N.A. v. Echo Acceptance Corp*., 380 Fed. App'x 513, 522 (6th Cir. 2010) ("under Ohio law, a contract remedy is exclusive *only if the parties so stipulate*") (emphasis added).

### d. Mitigation of Damages

Defendants maintain that Plaintiff has failed to mitigate its damages as required under Ohio law.  On this issue, too, the Court finds summary judgment inappropriate.

Regarding efforts to sell the products remaining on the blankets, Craig Dean testified that he sent his sales team to talk to their counterparts at NWL, the company that acquired CEP Florida.  Those efforts were unsuccessful, prompting Dean, as CEO of Dean Technology to "reach[] out" to *his* counterpart at NWL, David Seitz.  (Dean tr. at 50-52 (Doc. 24, Exh. A).)   Dean recalled their first conversation as follows:

> I explained who I was.  I explained the situation.  I explained what happened.  And he explained to me that the open purchase order contracts we had from CE Power were not included in his asset purchase agreement and that he considered building these assemblies an upside on the deal and that if the agreements were included in the sale – if those orders were included in the sale, he would have honored them, but they weren't and if they had, you know, included them, he would have adjusted the price accordingly for the purchase of the company.  I explained the situation, that we had material and we had these open orders and we really wanted to resolve it, and he said he would think about it.

(*Id.* at 52-53.)   Throughout a six-week period, Dean made numerous attempts to contact Seitz-both by phone and email-to follow-up.  Ultimately Seitz advised Dean that he was not interested in the products.  Dean denies that Seitz ever made any kind of formal offer; talking "roundabout", Seitz told Dean, "More or less I could give you thirty percent of your sale price."  (*Id.* at 54.)  Seitz's testimony confirms this informal exchange.  He recalls "indicating a range that would have been in maybe the 25 or 30 up to 50 percent of what Craig said his price was."  (Deposition of James David Seitz at 7-8 (Doc. 24, Exh. F).)  Based on this testimony, Defendants ask the Court to hold as a matter of law that any damages that Plaintiff might recover be reduced by at least 30%.

As a general matter, a plaintiff seeking redress for breach of contract has a duty to mitigate. *F. Enterprises, Inc. v. Kentucky Fried Chicken Corp.* (1976), 47 Ohio St. 2d 154, 159-60, 351 N.E.2d 121, 125. But because the purported contract here involves the sale of goods, the UCC applies, a circumstance that Defendants all but ignore. Ohio Rev. Code §§ 1302.78(B) (UCC 2-704), 1302.80 (UCC 2-206) and 1302.82 (UCC 2-708) all speak to a seller's remedy in the event of a breach, with the seller's conduct being measured against a standard of "commercial reasonableness." Moreover, the repudiating buyer bears the burden to prove that the seller has failed to use "reasonable commercial judgment." *Young v. Frank's Nursery & Crafts, Inc.* (1991), 58 Ohio St. 3d 242, 244, 569 N.E.2d 1034, 1037.

Defendants have produced no evidence as to what would have been commercially reasonable under these circumstances. Rather, they take the position that Dean Technology was required to accept *any* offer in mitigation, which is contrary to law. Accordingly, because a material question of fact remains as to whether Plaintiff acted in a reasonable commercial manner with regard to mitigation, Defendants' motion for judgment as a matter of law on this subject is DENIED.

## III.    CONCLUSION

In summary:

1.  Defendants' Motion to Dismiss for Lack of Subject-Matter Jurisdiction (Doc. 21) is **DENIED**;

2.  Plaintiff's Motion for Summary Judgment is **DENIED** (Doc. 28); Defendants' Motion for Leave to File a Sur-Reply Brief in Opposition to Plaintiff's Motion for Summary Judgment (Doc. 42) is also **DENIED**; and

3.  Defendants' Motion for Partial Summary Judgment (Doc. 24) is **GRANTED** on the issue of whether attorneys' fees can be awarded as damages should Plaintiff prevail on its breach of contract claim, but **DENIED** in all other respects.

   **IT IS SO ORDERED**.

Dated:  3/30/2015                                     *s/ Timothy S. Black*
                                                      Timothy S. Black
                                                      United States District Judge